March 8th, 1909.

———o———

No. 4617.

Court of Appeal, Parish of Orleans.

INTERSTATE COMMISSION COMPANY VS. BORDES AND GRANGER ET ALS.

Questions of fact only are involved herein.

Appeal from Civil District Court, Division "C."

Morgan & Milner, for Plaintiff and Appellee.

P. J. Patorno, Albert Voorhies, for Defendant and Appellant.

MOORE, J. Plaintiff corporation does a commission business in Fort Worth in the State of Texas.

The defendant firm deals in cattle in the city of New Orleans.

Frank Robbins, who resides in Fort Worth, was engaged in that city in buying cattle and shipping them to the defendant firm. He had arranged with the plaintiff corporation that as each carload or loads of cattle were purchased by him and ready for shipment to New Orleans, the plaintiff corporation would advance the amount necessary to pay for the cattle at Fort Worth and would accept Robbins' sight draft on the defendant firm for the amount so loaned and advanced plus three dollars per carload, which was agreed on as plaintiff's compensation for the loans and advances so to be made.

This arrangement was entered into by the plaintiff upon the belief that Robbins was purchasing cattle for and on account of the defendant firm as their duly authorized agent and as such authorized to draw on his firm for such sums as may be specifically advanced for and actually used in the purchase of cattle for defendant firm. This belief was entertained by reason of the assurance on the part of Robbins that he was so acting and authorized and by the further reason that Robbins was so regarded and understood in the community and especially at the stock pens and exchanges and among dealers in cattle generally in and around Fort Worth.

The first transaction of the character started between plaintiff and Robbins was on the 7th of June, 1906, when the latter applied for a sum sufficient to pay for cattle then purchased by him and which was ready for shipment to defendant firm. The amount, including the commission of $3.00 per car then so advanced was $497.00.

Upon taking Robbins draft on defendant firm, plaintiff at once wired defendant firm as follows: "Will you pay Robbins' draft, four hundred and ninety-seven dollar car cattle," to which defendant firm promptly replied: "Yes, will pay Robbins' draft for amount specified." The draft was forwarded and duly honored.

Immediately after sending the wire above stated plaintiff wrote defendant firm as follows:

"We have made arrangements with Mr. Frank Robbins to pay for what cattle he buys on the yards here for

—208—

shipment to your house at New Orleans provided you will guarantee to give us your bank's written guarantee that you will pay his drafts on you for the purchase price of the cattle. We think it best for you to give us a guarantee from your bank stating that they will honor Frank Robbins' draft on you for cattle bought at Fort Worth yards for shipment to your house at New Orleans. We ask this as we have never done any business with you before. We wired you to day as follows: Will you pay Robbins' draft 497 car cattle which we beg to confirm and await your answer."

On the 8th June, 1906, Robbins bought a lot of cattle and at once shipped them to the defendant firm as *usual*. This lot consisted of 26 steers for which the price was $687.68. This sum he obtained from plaintiff corporation and paid it at once to the several parties from whom he had purchased the steers. Thereupon he gave a draft on defendants and in favor of plaintiff for $690.80 being the sum of $3.00 added as commission to plaintiff and 12 cents bank discount.

On the 12th June, 1906, plaintiff wired defendants: "Sell twenty-eight steers shipped for Robbins remit proceeds to us." To this no reply was made, whereupon plaintiff on the following day wired defendants: "Has car steers shipped by us account Robbins arrived, answer."

On the 13th June, 1906, defendants wired back: "We received car steers Monday from Frank Robbins." To which plaintiff replied by wire: "We paid Robbins' steers. Are you sending proceeds? Answer."

On the following day defendants wire plaintiff: "Steers not yet close out. Letter will reach you to-morrow."

On the 15th June, 1906, plaintiff received the following letter from defendants, dated June 12th, 1906:

"Your wire to hand and duly noted. I had promised Mr. Robbins to pay for cattle provided he would buy so as to leave a margin at this end of the line, but told him I could not stand any more losses, as he owed me more than I could stand for already. I have paid for first carload of yearlings, though they will prove to be money losers. But the load of steers coming in at a loss following the yearlings,

is more than I will stand. I can not agree to pay for the steers, but will allow the proceeds to go to the credit of his account. Regretting to be forced to do this, and hoping that Robbins will make the amount good to you, etc."

To which the plaintiff at once replied as follows:

"Your letter of the 12th and wire of the 14th inst. duly received and contents noted. We are very much surprised at same as Mr. Robbins informed us before he made the deal with us to pay for these cattle, and that he had made arrangements with your house whereby you would pay his draft for all cattle that he bought in the Fort Worth Stock Yards for shipment to your house at New Orleans. Seeing that you refused to pay the draft that Mr. Robbins drew on you through us for $690.80, purchase price on one carload of steers, we do not see that you have any right to place the proceeds of these steers to credit of his account. Hoping you will remit us the proceeds for this carload of steers at once and so save further trouble and expense. Respectfully, etc."

No reply was made to this letter and as defendant firm refused to honor the draft, suit for the amount due followed.

It is shown by the testimony of Frank Robbins that he first began to act for the defendant firm in buying cattle for and shipping same to them in February, 1905. Prior to his arrangement with the plaintiff corporation he would draw his drafts on the defendants in favor of the individual sellers of the cattle for the amount of the purchase price, the purchasers, it being shown, being one, two, three or more from different parties until a carload lot can be gathered and sent forward. These drafts were always paid. In June, 1906, he arranged with the plaintiff corporation to take up "tickets," which would be used at the stock pens when cattle were purchased, so that the individual sellers would receive their pay in cash at Fort Worth instead of a draft and that when a car load lot was thus purchased and paid for by plaintiff and shipped, one draft for the aggregate amount so paid out, plus a commission of $3.00 per car, would be given plaintiff. This arrangement with plaintiff Robbins says he fully explained to the defendant firm and that they approved of it and they told him to "go ahead and do it."

He testifies that "he did not buy and solicit shipments for the defendants on a commission, but on a *salary* basis of one hundred dollars per month which was regularly paid him up to the transaction under discussion on drafts which he drew monthly therefor. He says that "he was their agent to purchase cattle and make drafts on them for the purchase price." Prior to this arrangement with the plaintiff corporation he had innumerable transactions with a number of dealers at Fort Worth in the purchasing of cattle for defendants, the shipping of same to them, and the drawing of drafts therefor on them all of which were duly honored. In this he is fully corroborated by several witnesses who show that he was generally known in the market as the representative and purchasing agent of the defendants.

But more than this, it is conclusively shown that Mr. Granger, a member of the defendant firm whilst on a visit to Fort Worth held out Robbins as the authorized agent and representative of the defendant firm. This is testified to by several cattle men with whom Robbins had transactions in the buying and shipping of cattle for defendants. J. W. Fields first met Granger in the stock yards at Fort Worth and enquired of him "If he was in with Robbins?" To which Granger replied: "We are paying his drafts and that he (Granger) was up here looking over the business." "Whilst he was here he and Robbins would figure together on cattle I tried to sell them," adding, "From the dealings I had with Robbins and from my conversations with Mr. Granger I understood that Robbins was authorized to draw on them for money."

G. W. Hoover testified that Granger told him that his (Granger's) firm would pay all Frank Robbins' drafts on them." And W. R. Keyser testifies to the same effect.

Carrie Lowe, the bookkeeper of Boustand-Barefoot Stock Commission Co., at Fort Worth, testifies that Granger called at her office and instructed her "to take Mr. Robbins' draft on them (defendants) and that it would be paid in payment of cattle bought from the firm." "All I know about it is that Mr. Granger told me that his firm would pay Robbins' draft for all tickets for cattle sold to him, but who he was reputed to be representing I do not know." "All I know is that he (Robbins) gave drafts on the defendants in payment of cat-

—211—

tle that he had bought from the firm and that Mr. Granger told me that the draft would be paid, but can't say who he was acting for.''

Granger does not testify in the cause, although the testimony of all these parties, including Robbins, which was taken under commission was returned into court and filed in the cause for more than a year previous to the day of trial.

The sole witness who testified for defendants is its senior member, Joseph Bordes.

His testimony is vague, general and unsatisfactory. He says that when he sold the 26 head of steers he put the proceeds, after deducting his commission, to the credit of Robbins who he says was indebted to him. He cannot state the amount for which they sold nor when they were sold. He says that *he* never told the plaintiff company or any one else in Fort Worth that he would pay Mr. Robbins' *indebtedness* (sic) nor did he ever authorize that company to advance money to Mr. Robbins for his account.

On cross-examination he admits meeting Robbins in New Orleans where the latter discussed ''this particular transaction,'' that is about ''buying cattle in Texas.'' He can give little information about the sale of the 28 head of steers, when they arrived, or when sold or for what price, and although he stated that he would produce the account sale of the steers, no such is found in the record. Finally he admits that the 28 head of steers had not ben sold when the telegrams above recited were received by him. He says that Robbins owed him $2,900 and that is why he put the proceeds of the sale of the steers to the credit of this account. He admits that during the course of Robbins' business connection with the defendants, Robbins had shipped them about 200 carloads of cattle, drawing drafts on them for each and that all of them were honored save and except the one in question.

No attempt is made to direct his attention to the testimony, taken under commission, of Robbins, to the ffect that he, Robbins, was working for defendants on a salary of $100 per month which was regularly paid; that in June, 1906, Robbins fully advised the defendants as to the arrangement and understanding with plaintiff company and of defendants' approval thereof;

and, to the fact that defendants never gave nor was it ever understood that they should give the benefit of profits or of proceeds of sale of cattle bought by Robbins and shipped to them, to Robbins, and that defendants had adopted a system in their business of keeping an account against him, charging him with profits, losses and commission for the purpose of keeping him (Robbins) "posted" as to how to buy cattle, and to determine whether the employment of Robbins at $100 per month was profitable. This testimony, as well as that of the other witnesses referred to above, though in the record long before the trial of the cause, is not contradicted.

The lower judge had the benefit of seeing the only witness who testified in open court and hearing his testimony—the senior member of defendants' firm—yet he resolved the case against the defendants.

We are of opinion that the facts clearly establish that Robbins was purchasing for the account of defendants; that the money advanced by plaintiff was for their use and benefit; that Robbins was authorized and empowered by the defendants to draw drafts on them for all cattle purchased for and shipped to them; that the lot of cattle for which the draft sued on was given, was bought for account of defendants and that as a consequence defendants are liable for the money advanced to pay for same.

The judgment is affirmed.

March 8th, 1909.

Rehearing refused April 7th, 1909.